**CARPENTER (TEXAS) REALTY CORPORATION, Appellant,**

v.

**ALLEN CENTER CO. # 4, Metropolitan Life Insurance Company, and Metropolitan Tower Realty Company, Inc., Appellees.**

**No. 14–96–01207–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

June 11, 1998.

Opinion Overruling Rehearing July 23, 1998.

Robin C. Gibbs, J. Christopher Reynolds, Amanda Bowman Nathan, Houston, for appellant.

Jeff Joyce, Brian F. Antweil, Houston, for appellees.

Before AMIDEI, EDELMAN and SEARS, JJ.*

## OPINION

EDELMAN, Justice.

Carpenter (Texas) Realty Corporation ("Carpenter") appeals a judgment entered in favor of Allen Center Co. # 4, Metropolitan Life Insurance Company, and Metropolitan Tower Realty Company, Inc. (collectively "MetLife") on the grounds that: (1) the trial court erred by permitting MetLife to elicit parol testimony concerning the intent of an unambiguous agreement; and (2) the jury's verdict was against the great weight and preponderance of the evidence. We affirm.

### Background

In 1986, Enron entered into a lease with MetLife (the "MetLife lease") for office space in Four Allen Center, a building Met-Life owned in downtown Houston. The lease contained a twenty-year base term and six five-year renewal options. MetLife and Carpenter also entered into a commission agreement (the "commission agreement") whereby Carpenter would be paid a commission on the aggregate rentals over the twenty year base term of the MetLife lease and for each renewal, extension, or expansion of it. In the event of a sale of Four Allen Center, MetLife would remain liable to Carpenter for future commissions unless MetLife arranged for the

* The Honorable Justice Ross Sears sitting by as- signment.

buyer to assume payment of those commissions.

Enron eventually occupied the entire Four Allen Center and agreed to buy it from Met-Life. However, to achieve "off balance sheet" financing, Enron structured the transaction so that a consortium of banks paid for the building, a trustee held title to it, and Enron leased the building from the trustee. In simultaneous transactions on September 27, 1991, the sale was closed for $281.5 million, Enron and MetLife terminated the Met-Life lease, and Enron entered into a three-year lease with the trustee.

MetLife agreed to pay Carpenter $5.75 million for the remaining commission on the base term of the MetLife Lease. However, Carpenter claimed that it was also entitled to commissions on rents for renewal periods, the value of which were reflected in the sale price of the building. MetLife neither paid nor arranged for anyone to assume liability of those commissions.

In 1992, Carpenter sued MetLife and Enron for breach of the commission agreement and tortious interference, respectively, asserting that they had arranged the sale of Four Allen Center as a sham to deprive Carpenter of commissions for future renewals or extensions. MetLife and Enron moved for and were granted summary judgment on Carpenter's claims.

On appeal, this court affirmed the judgment in favor of Enron on the affirmative defense of justification[1] but reversed and remanded the judgment for MetLife holding that: (a) a broker is entitled to his commission notwithstanding the failure of a condition precedent if the lessor gets the benefit of the tenant's obligation to pay rent or if the lessor is responsible for the failure of the condition;[2] (b) MetLife's termination of the MetLife lease made the condition precedent of an exercise of the renewal options impossible; and (c) a fact issue remained whether MetLife received a benefit from the projected occupancy of Enron beyond the base term of the lease such that some of the renewal

options in the MetLife lease had been constructively exercised. *See Carpenter (Texas) Realty Corp. v. Metropolitan Life Ins. Co.*, No. 14–92–01287–CV, 1993 WL 312079, at *3 (Tex.App.—Houston [14th Dist.], August 19, 1993, writ denied).

At trial on remand, the following liability question was submitted to the jury:

Did MetLife receive a present benefit from Enron's projected occupancy of Four Allen Center beyond the base term of the MetLife/Enron Lease in the form of an elevated sales price for Four Allen Center?

You are instructed that the termination of the Lease did not extinguish Carpenter's rights under the Commission Agreement.

You are instructed that there need not be an actual exercise of lease renewal options by Enron in order to find that Met-Life failed to comply with the Commission Agreement. Rather, if MetLife received a benefit in the form of an elevated sales price for the projected occupancy of Enron beyond the base term of the Lease, the law will deem the renewal options constructively exercised. The fact that the benefit MetLife received was in the form of an elevated sales price rather than as payment of rent is not significant.

The jury answered "no" to this question, and a take nothing judgment was entered on Carpenter's claims against MetLife.

### Intent Evidence

Carpenter's first point of error argues that the trial court erred in repeatedly permitting MetLife's counsel, over objection, to elicit testimony concerning the intent of the commission agreement because that agreement was not ambiguous and had already been construed by this court.

The admission or exclusion of evidence is reviewed for abuse of discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). No judgment may be reversed and remanded unless the error complained of was reasonably calculated to cause and prob-

---

**1.** Carpenter did not appeal the affirmance of the judgment as to Enron.

**2.** *See Stitt v. Royal Park Fashions, Inc.*, 546 S.W.2d 924, 927 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.).

ably did cause rendition of an improper judgment or prevented appellant from making a proper presentation of the case to the appellate court. *See* TEX. R. APP. P. 81(b) (current version at TEX. R. APP. P. 44.1).[3] A successful challenge to an evidentiary ruling usually requires the appellant to show that the judgment turns on the particular evidence admitted or excluded. *See City of Brownsville*, 897 S.W.2d at 753–54.

 When a written agreement is unambiguous, parol evidence is inadmissible to vary, add to, or contradict its terms. *See Stauffer v. Henderson*, 801 S.W.2d 858, 863 (Tex.1990); *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 31 (1958). Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the intentions of the parties expressed in the contract. *See Friendswood Development Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex.1996).

In this case, during MetLife's cross-examination of Mary Wyatt, a lead negotiator for Enron on the purchase of Four Allen Center, the following exchange occurred:

Q. Did you ever hear before this deal closed [that] Mr. Carpenter was claiming $9.8 million?

A. I did not know what the number was.

Q. When you started out at 270 and the price finally got to 280, that's a ten-million-dollar difference, isn't it?

A. Yes.

Q. Did you in your wildest dreams think that Mr. Carpenter would want to get 98 percent of it as a commission?

MR. GIBBS: I'm going to object.... This Court has already made pretrial orders as to what the meaning of the contract is and that question is an attempt to vary the contract.

\* \* \* \*

THE COURT: Objection will be overruled.

Q. Did you in your wildest dream think Mr. Carpenter thought as a leasing commission person who would get 2 percent of

the rent that he would get 98 percent of the increased [sale] price?

A. No. Frankly, I wouldn't have thought about it, period.

During MetLife's questioning of George Carpenter about the commission agreement, the following exchange took place:

Q. Well, the thought didn't occur to you to make a run on renewals when you sat down and talked to Mr. Schneider in March of '91, and the reason is no one ever intended that you would get an advanced payment for renewal options just because the building sold, did they?

A. Mr. Joyce, I was looking to the commission agreement and for the parties to honor what was in the commission agreement.

Q. Yes, sir. And no one ever intended that you would get an answer [sic] advanced payment for renewal commissions ... when the building sold, did you?

A. I'm not sure what they knew because I was kept totally in the dark about the entire transaction

Q. I'm asking you about the intent in the commission agreement. No one ever intended—

MR. REYNOLDS: Objection, Your Honor. There's no allegation that it's—it's ambiguous and it's an attempt to modify or vary it by parol evidence.

MR. JOYCE: I'm asking about what this witness knew when the deal was going on and why he didn't say anything, Your Honor.

\* \* \* \*

MR. REYNOLDS: My objection is simply the Court has construed what rights exist in the event of a sale and this man's testimony concerning this intent is therefore improper under the parol evidence rule.

MR. JOYCE: My response is this relates to what Miss Wyatt had in her mind when she first heard Mr. Carpenter was going to make a run on renewals.

---

**3.** Because this appeal was perfected before September 1, 1987, it is generally governed by the Texas Rules of Appellate Procedure in effect before that date.

THE COURT: Objection will be overruled.

Q. Mr. Carpenter, no one ever intended that this commission agreement would provide for advanced payment to you of renewal commissions just because the building sold, did they?

A. I believe the commission agreement speaks for itself. Whatever the commission agreement says is what I was expecting the parties to live up to.

\* \* \* \*

Q. Now, not even you intended that if Enron bought that building ... that that would automatically mean you'd get renewal option years paid in advance, did you?

A. I never even had that thought because I expected the parties who signed the agreement to live by the agreement.

Q. Yes, sir. But the agreement doesn't provide that you automatically get triggered advance renewal commissions, does it, sir?

MR. REYNOLDS: Your Honor, I object. The Court has construed the agreement and testimony about this man's understanding of it is just irrelevant and contemplated to slow this down.

THE COURT: It's overruled.

■ Viewed in the light most favorable to Carpenter, the foregoing questioning can be interpreted as an attempt to portray his commission claim as an unreasonable and unintended windfall, inconsistent with this court's opinion in *Carpenter*.[4] However, even though the objections were overruled and the questions were allowed to be asked, the thrust of the witnesses' answers was that Wyatt had not thought about the contention, and Carpenter countered it. Under these circumstances, Carpenter has not demonstrated that it was harmed by the complained of questions or answers. Therefore, we overrule Carpenter's first point of error.

4. *See Carpenter*, 1993 WL 312079 at \*4, 5 (holding that, because MetLife's termination of the MetLife lease made actual exercise of the renewal options impossible, if MetLife derived a present benefit from the projected occupancy of Enron beyond the base period of the lease, then Carpenter would be entitled to the present value

## Factual Sufficiency

Carpenter's second point of error claims that the jury's negative answer to the liability question was against the overwhelming weight of the evidence, and the trial court therefore erred in overruling Carpenter's motion for new trial. In reviewing factual sufficiency, we weigh all of the evidence in the record and overturn a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

■ In this case, Carpenter claims that it was undisputed that only a portion of the $281.5 million paid for Four Allen Center was attributable to the value of the base term of the MetLife lease and that MetLife expressly refused to sell the building until Enron agreed to pay a price that included a substantial premium for the renewal periods under that lease.[5]

However, the value of the building was independently appraised at $287 million by valuing the remaining base term of the MetLife lease at $235 million and the "reversion" value of the building, vacant and available for lease at the end of the base term, at $52 million. In addition, the information memorandum prepared for Enron's prospective lenders stated "The Purchase Price for the Property represents the $250.0 million present value of Enron's current lease payments ... plus the present value of the residual value for the Property of $31.5 million." Moreover, a June 26, 1991 letter from Carpenter to Enron states in part:

Per my conversations Tuesday afternoon with Brian Schneider of [MetLife], please find outlined below the economics, as [MetLife] views them, regarding the prospective sale of The Enron Building.

of its commissions on the constructive renewals or extensions).

5. The arguments and evidence supporting this position are described further in the dissenting opinion.

| | |
|---|---|
| [MetLife's] Price | $ 285 Million |
| Enron Lease Value | $(239) Million |
| Value of Building* | $ 46 Million |
| Value/1,250,000 RSF | $ 36.80/RSF |
| Enron Corp.'s Price | $ 275 Million |
| Enron Lease Value | $(239) Million |
| Value of Building* | $ 36 Million |
| Value/1,250,000 RSF | $ 28.80/RSF |

* Empty building with no income stream.

With respect to this June 26 letter, Wyatt testified on cross-examination:

Q. And it's reported by Mr. Carpenter that [MetLife's] view at the time was that residual value is based on an empty building with no income stream, right?

A. Right.

Q. In other words, Mr. Carpenter is telling his friend Mr. Barnhart, [MetLife] says the deal is worth this even if you assume Enron moves out and the building is empty in 2006?

A. That's right.

Q. Meaning [that] Enron doesn't exercise any renewal options?

A. That's right.

The foregoing is evidence that the portion of the $281.5 million elevated sales price above the value of the base term of the MetLife lease was attributable to the value of the empty building at the end of the base term rather than to any projected revenues from renewals of the lease thereafter. Thus, it was evidence that MetLife received *no* benefit from the elevated sales price for the projected occupancy of Enron beyond the base term of the lease. In light of this evidence supporting the jury's negative answer to the liability question, we are not persuaded that the jury's verdict is so against the great weight of the evidence as to be manifestly wrong or unjust. Accordingly, we overrule Carpenter's second point of error and affirm the judgment of the trial court.

AMIDEI, Justice, dissenting.

I respectfully dissent.

This is the second appeal of this case. Thus, "the law of the case" doctrine mandates that the ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings of the same case. *See Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986); *Aycock v. State,* 863 S.W.2d 183, 187 (Tex.App.—Houston [14 th Dist.] 1993, writ ref'd). Matters of law that were disposed of on a former appeal will not again be decided by the court. *See id.* The doctrine does not apply to questions of fact, but only to questions of law. *See Thomas v. Collins,* 860 S.W.2d 500, 502 (Tex.App.—Houston [1 st Dist.] 1993, writ denied). The significance of the doctrine is its usefulness in achieving uniformity of decision as well as judicial economy and efficiency. *See id.* The doctrine does not apply if the issues and facts are not substantially the same in the subsequent trial. *See Medical Ctr. Bank v. Fleetwood,* 854 S.W.2d 278 (Tex.App.—Austin 1993, writ denied).

In the first appeal, we held:

[A]n unfulfilled condition precedent in a real estate brokerage contract will not defeat the broker's right to claim his commission if the broker has fully complied with all of his obligations under the terms of the contract and if the condition is not fulfilled due to the default of the broker's principal ... The condition will then in law be excused and the broker can recover his commission.

*Albright v. Texcellere Corp.,* 561 S.W.2d 533, 538 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.)

In other words, "[A] broker is entitled to his commissions notwithstanding failure of [a] condition precedent if the lessor gets the benefit of the obligation to pay the rent *or if the lessor himself is responsible for failure of the condition."* *Stitt v. Royal Park Fashions, Inc.,* 546 S.W.2d 924, 927 (Tex.App.—Dallas 1977, writ ref'd n.r.e.).

*Carpenter (Texas) Realty Corp. v. Metropolitan Life Ins. Co.,* No. 14–92–01287–CV, 1993 WL 312079, at *3 (Tex.App.—Houston [14 th Dist.] Aug. 19, 1993, writ denied) (emphasis added).

Neither our previous opinion nor the cases cited therein require both a benefit and a default by the landlord or seller. It is uncontroverted that MetLife was responsible for

the failure of the condition by its termination of the lease, and Carpenter fully complied with all of its obligations under the commission agreement. The trial court did not rule on these issues. Our prior opinion further held:

> The commission agreement also provided that MetLife would supply Carpenter with an agreement whereby State Street would pay Carpenter's future commissions for renewals and extensions of Enron's lease (from 2006 and beyond) or MetLife would remain liable for the commissions. But MetLife and Enron had terminated their lease, and MetLife was unable to provide Carpenter with an agreement by State Street to pay commissions on renewals or extensions of a canceled lease.

*Id.* at *2. MetLife breached the agreement by failing to provide Carpenter with an agreement by State Street to pay commissions on renewals or extensions of the canceled lease from 2006 and beyond. MetLife chose not to require Enron to require its wholly owned State Street corporation to make such an agreement with Carpenter. The reasons MetLife chose this course of action are immaterial, but obvious. The fact is MetLife knew or should have known it was still obligated to Carpenter to obtain such an agreement, but chose to breach that obligation. These facts are not disputed.

As a matter of law, we are required to use the law of the case doctrine and render judgment in favor of Carpenter for its commissions as the trial court should have rendered. *See Hudson,* 711 S.W.2d at 630. Carpenter cannot waive the law of the case even though the case was tried solely on the benefit issue and the jury held against him on the issue. *See J.O. Lockridge General Contractors, Inc., v. Morgan,* 848 S.W.2d 248, 250–51 (Tex. App.—Dallas 1993, writ denied). The *J.O. Lockridge* case was a case of first impression on the question of whether a party may waive the law of the case doctrine by failing to object that the case in the second trial was not tried according to the law of the case. J.O. Lockridge General Construction, Inc. sued Morgan for repairs on an apartment complex claiming Morgan acted both for himself and as agent for others. In the first

appeal, the appellate court held as a matter of law that Lockridge had no claim against Morgan and the others under an apparent authority theory; and that there were fact questions for actual and implied authority. At the second trial, a jury found that Morgan did not have either actual or implied authority to act for the other parties. However, the jury found that Morgan had apparent authority. The trial court granted Morgan and the other parties a judgment notwithstanding the verdict. On the second appeal Morgan contends that the law of the parties prevents reconsideration of the issue of apparent authority. *See id.* at 249. Lockridge, on the other hand, complained the trial court erred in granting judgment notwithstanding the verdict because there was sufficient evidence to support the jury's finding of liability on apparent authority. Morgan and the other parties did not object that the law of the case doctrine prohibited submission of the theory of apparent authority or as their support for their motion N.O.V. *See id.* at 250.

Nevertheless, the court of appeals held that a party cannot waive the law of the case doctrine, and held:

> We conclude that a party *cannot waive the doctrine.* We do so because the doctrine protects our opinion and judgment. It is our Court that determines whether the law of the case doctrine applies on the second appeal of a case. This is so because we do not again pass on any matter that was either directly or indirectly disposed of on a former appeal....

> We conclude, in this second appeal, that the law of the case doctrine governs the issue of apparent authority. We hold that our determination in the first appeal that appellant may not recover from the appellees on the theory of apparent authority applies as a matter of law. The trial court did not err in entering judgment for the appellees in the second trial of the case. Because of this determination, we do not reach the merits of appellant's two points of error. We summarily overrule those points of error.

*Id.* at 251 (citations omitted).

Therefore, using the principles of the *J.O. Lockridge* case, I would hold that Carpenter

did not waive the law of the case by agreeing to submit the case on a theory of whether MetLife benefitted. The law of the case doctrine requires us to reverse and render in favor of Carpenter because MetLife defaulted when it terminated the lease with Enron although Carpenter fully complied with the commission agreement, and failed to obtain an agreement with State Street corporation to pay Carpenter's future commissions for renewals and extensions of Enron's lease from 2006 and beyond. *See* TEX.R.APP. P. 82.

## Point of Error Two

Although Carpenter should have prevailed as hereinabove discussed, it had an alternative independent ground of recovery under Jury Question No. 1 as to whether MetLife benefitted from Enron's projected occupancy and the elevated sales price therefrom.

Carpenter's Point of Error No. 2 complains that it should have been granted judgment notwithstanding the verdict on Jury Question No. 1 because the jury's answer was against the overwhelming weight of the evidence. Jury Question No. 1 as to Met Life's liability inquired whether MetLife received a present benefit from Enron's projected occupancy of Four Allen Center beyond the base term of the MetLife/Enron Lease in the form of an elevated sales price for Four Allen Center. The court instructed the jury that in the event of such elevated price to MetLife the law will deem the renewal option constructively exercised and there need not be actual exercise of such renewals. Further, the court instructed that Carpenter's commission rights were not extinguished by the termination of the Lease, and the fact MetLife benefitted from an elevated sales price rather than rent is not significant.

Carpenter was only paid a portion of its commissions attributable to the base term of the Lease which was valued at $235,078,500. Additionally, despite the lease having been prematurely terminated by MetLife prior to Enron actually purchasing the property, Carpenter was paid commissions on rentals Met Life would have received until 2006. Although Enron assigned its right to purchase to State Street, the resulting purchase constructively renewed or extended the lease in so far as it concerned Carpenter's right to the lease commissions. MetLife and Enron both finally appraised Four Allen Center at a value of $281,500,000 and settled on that amount as the purchase price which Enron accepted to purchase the property in September 1991. During the negotiations MetLife refused to sell until it received a value which included the value of the three, five year renewal periods, i.e., the difference between $235,078,500 and $281,500,000. The parties agreed to these amounts and used them to consummate their transaction. These basic facts prove without any doubt that MetLife received a benefit beyond the base term of the Lease, in the amount of $46,421,500. The fact that the purchase price greatly exceeded every valuation of the base term established that MetLife derived a present benefit from a prospective occupancy.

What MetLife or Enron thought, perceived, discussed, or wrote prior to the closing of the sale of the building was not relevant to Jury Question No. 1 which inquired about the benefit to MetLife. Everything MetLife did up until the closing was calculated by MetLife to benefit MetLife. MetLife was not in the business to benefit Enron and would not have consummated the sale if it did not benefit MetLife. All Carpenter had to do was prove MetLife benefitted; it did not have to disprove the mental gymnastics of MetLife and Enron which are reflected in the irrelevant testimony the majority uses to uphold the Jury Question No. 1. The reason "why" Enron paid a substantial price over the value of the base term of the Lease, was irrelevant. It cannot be disputed that the overwhelming weight of the evidence established that MetLife received a present benefit from a projected occupancy beyond the base term of the Lease. Also, in any event, MetLife received a benefit by obtaining a substantial buyer of its property, and by not being responsible for management of the property after the sale.

Rather than discuss the controlling facts, the majority only focuses upon irrelevant testimony to support the jury verdict. First, Steven Cates, MetLife's principal negotiator,

and Jarris Page, director of corporate property management, testified that "the property information package" was not the basis for the ultimate $281.5 million purchase price, and that MetLife uses the information as a guide for valuing its property holdings and for planning. This testimony could not change the fact that MetLife finally appraised the building at $281.5 million. Second, an independent appraisal which did not consider in appraising the building at $287 million Enron's commitment to exercise the renewal options is contrary to fact. This testimony may be what went on internally at MetLife but is irrelevant[1] and self serving and does not change the final appraisals or the basic facts one scintilla.[2] Third, the same can be said about the testimony of Mary Wyatt that Enron sent prospectus' to banks which stated MetLife's perception of the sale presumably to improve its standing to obtain loans with these banks. What Enron does to obtain credit is also a self serving, internal matter which is not relevant to the question of benefit to MetLife. The testimony does not tend to prove MetLife did not benefit from the elevated sales price. The prospectus does not disagree with the final appraisal of the purchase of $281.5 million.

The most compelling evidence the majority could find was a letter from Carpenter to Enron dated June 26, 1991. No matter what was stated in that letter, it was not binding on any party before or after the sale of the building. This letter merely relayed some conversations regarding "the economics" as MetLife viewed them at some time prior to June 26, 1991. Part or all of these "economics" could have changed by the time of closing. Wyatt's testimony regarding this letter was only a conclusion that MetLife benefitted by $235.5 million if Enron renewed the lease options and stayed in the building. I disagree with the majority's conclusion that

Carpenter was aware that Enron and MetLife were negotiating in a range without consideration of the renewal options, and were merely reaching the mid-point of their positions. We can only assume Carpenter was aware that the negotiations should have included the renewal options since the final appraisals indicated they were included. The economics of MetLife sometime prior to June 26, 1991, is not evidence to contradict the fact the building was finally appraised and sold for $281.5 million. Those economics only show Carpenter knew about them as of June 26, 1991, and nothing more. The June 26, 1991 letter and Wyatt's testimony about it are not probative. The parties perceptions prior to the final appraisals and sale of the building are simply not relevant to the issue of benefit to MetLife. MetLife was obviously trying to get out of paying the commissions rightfully owed to Carpenter. It may not have been tortious interference on Enron's part but MetLife colluded with Enron to bring about the cancellation of the lease and the assignment of the lease to State Street, the new corporation owned by Enron. No prior notice was given to Carpenter prior to the termination of the lease. The lease should be considered as still owned by Enron because Enron controls State Street and State Street's only purpose is to hold title to the building and the assigned lease for three years until Enron goes through the motions of taking title to the building.

Appellant contends the trial court erred in repeatedly permitting appellee's counsel, over objection by appellant's counsel, to elicit testimony concerning the "intent" of the commission agreement since the agreement was not ambiguous and had already been construed by this court. As we previously construed Carpenter's rights under the commission agreement and found that the agreement was not ambiguous, it could not be varied by parol evidence or surrounding cir-

---

1. "Relevant Evidence" means evidence barring any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* TEX.R. CIV. EVID. 401. None of appellee's evidence has a tendency to prove any fact of consequence to the determination of this case.

2. In reviewing a no evidence challenge, we consider only the evidence and reasonable inferences supporting the challenged finding and overrule the challenge if more than a scintilla of evidence supports the finding. *See Minnesota Mining & Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 738 (Tex.1997).

cumstances of the parties subject intent. *See Carrabba v. Employers Casualty Co.,* 742 S.W.2d 709, 716 (Tex.App.—Houston [14th Dist.] 1987, no writ).

During his direct examination of Mary Wyatt, Enron's land negotiator, MetLife's counsel asked the following:

Q. (By Mr. Joyce) Mr. Gibbs asked you about whether or not you knew Mr. Carpenter was trying to—or whether his rights were implicated to a 9.8 million-dollar commission. You remember that?

A. Yes.

Q. Did you ever hear before this deal closed Mr. Carpenter was claiming $9.8 million?

A. I did not know what the number was.

Q. When you started out at 270 and the price finally got to 280, that's a ten-million-dollar difference, isn't it?

A. Yes.

Q. Did you in your *wildest dreams* think that Mr. Carpenter would want to get 98 percent of it as a commission?

(Emphasis added). Carpenter's counsel objected on the basis of this Court's prior opinion and the parol evidence rule, but was overruled by the trial court. Further, during MetLife's examination of George Carpenter, MetLife's counsel asked:

Q. Well, the thought didn't occur to you to make a run on renewals when you sat down and talked to Mr. Schneider in March of '91, and the reason is *no one ever intended that you would get an advanced payment for renewal options just because the building sold, did they?*

A. Mr. Joyce, I was looking to the commission agreement and for the parties to honor what was in the commission agreement.

Q. Yes, sir. And no one ever intended that you would get an advanced payment for renewal commissions—

A. I'm not sure—

Q. —when the building sold, did you?

* * *

Q. Yes, sir. But *the agreement doesn't provide that you automatically get trig-* *gered advance renewal commissions, does it, sir?*

MR. REYNOLDS: Your Honor, I object. The Court has construed the agreement and testimony about this man's understanding of it is just irrelevant and contemplated to slow this down.

THE COURT: It's overruled.

(Emphasis added). Appellant's objection that the testimony is contrary to this court's construction of the agreement and was irrelevant and was erroneously overruled by the trial court.

The totality of this quoted testimony was to go behind the written commission agreement to attempt to show with oral testimony the agreement was unreasonable and absurd and to attack this Court's construction of it. Also, it violated the parol evidence rule. *Candlelight Hills Civic Assn. Inc. v. Goodwin,* 763 S.W.2d 474, 477 (Tex.App.—Houston [14th Dist.] 1988, writ denied); *Carrabba,* 742 S.W.2d at 716.

To some degree, this improper testimony must have improperly influenced the jury's answer to Question No. 1 because that answer was not supported by this testimony or any other evidence. The only ground upon which the jury's answer can be accounted for is that it took into consideration this objected to testimony. *See C.A. Bryant Co. v. Hamlin I.S.D.,* 18 S.W.2d 750, 751 (Tex.Civ. App.—Eastland 1929, no writ) (finding that the error caused by the admission of extrinsic evidence as to parties' rights and obligations under a contract that was wholly in writing was not harmless and justified remand for a new trial). The quoted testimony and the testimony of Steven Cates and Jarris Page was harmful because it was the only evidence MetLife produced. Therefore, since Jury Question No. 1 was answered in favor of MetLife, it demonstrates the entire case turned on such improperly admitted testimony. I am of the opinion that the error complained of amounted to such a denial of Carpenter's rights that it was reasonably calculated to cause and probably did cause rendition of an improper judgment in this case. *See* TEX.R.APP. P. 81(b)(1).

The testimony and the June 26, 1991 letter submitted by MetLife which are discussed hereinabove were irrelevant and self serving. Moreover, the testimony and the letter were harmful because they were MetLife's only purported evidence cited by the majority to uphold Jury Question No. 1 in MetLife's favor. After considering the undisputed evidence cited by this court in the previous appeal and propounded in the second trial which favored Carpenter, and the testimony cited by the majority to support Jury Question No. 1 in favor of MetLife, I would find there is no probative evidence to support the jury's finding in favor of MetLife. The jury must have been confused by the testimony offered by MetLife which was derogatory to Carpenter as well as our statement of the law of the case upholding the commission agreement. Further, I would hold that the answer to Jury Question No. 1 by the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). There is enough undisputed evidence to render judgment for Carpenter using the law of the case doctrine as previously discussed.

For these reasons, I respectfully dissent.

## ON MOTION FOR REHEARING

Carpenter's motion for rehearing asserts that, after having determined in our prior opinion [1] (*"Carpenter I"*) that Carpenter fulfilled its obligations and that MetLife made the condition precedent to Carpenter's renewal commissions impossible, this court should have rendered judgment for Carpenter in *Carpenter I* rather than merely remand. Carpenter further asserts that the failure of this court to do so in *Carpenter I* and the subsequent failure of the trial court on remand to correctly apply the law of the case set forth in *Carpenter I* could not be waived. Accordingly, Carpenter requests that we now reverse and render judgment in its favor based on the law of the case. We disagree for three reasons.

■ First, *Carpenter I* was an appeal of two summary judgments entered *against* Carpenter. Neither the opinion in that case nor Carpenter's briefs or motion for rehearing in this appeal indicate that Carpenter had filed a motion for summary judgment of its own. Therefore, Carpenter has not demonstrated how, in *Carpenter I*, this court could have granted Carpenter any affirmative relief in its appeal of two summary judgments entered against it.

■ Second, in the current appeal, Carpenter complained only of the admission of extrinsic evidence and the factual insufficiency of the evidence. As to each point of error, Carpenter's brief and reply brief specifically requested only reversal and remand. Nowhere did Carpenter's briefs request rendition of judgment nor would the sustaining of either of Carpenter's points of error have warranted that disposition. Therefore, Carpenter has not demonstrated how in this appeal we could properly: (1) have *sua sponte* raised an unassigned rendition point and then reversed and rendered judgment upon it; or (2) now grant such relief requested for the first time in a motion for rehearing.

■ Third, Carpenter contends that the law of the case set forth in *Carpenter I* established that MetLife's termination of the lease made the condition precedent to Carpenter's renewal commissions impossible, thereby automatically entitling Carpenter to judgment for commissions on all future renewals without regard to whether MetLife received any benefit therefrom. As Carpenter correctly asserts, *Carpenter I* stated, in part, that a broker is entitled to his commissions notwithstanding the failure of a condition precedent if the lessor gets the benefit of the obligation to pay rent *or* if the lessor himself is responsible for the failure of the condition. *See Carpenter*, 1993 WL 312079 at *3. Importantly, however, *Carpenter I* also recognized that the broker's right to claim his commission upon the failure of such a condition exists only where the broker has fully complied with all of his obligations under the terms of the contract. *See id.* In this regard, the law is clear that a broker is

---

1. *See Carpenter (Texas) Realty Corp. v. Metropolitan Life Ins. Co.*, No. C14–92–01287–CV, 1993 WL 312079, at *3 (Tex.App.—Houston [14th Dist.], August 19, 1993, writ denied).

not entitled to his commission until he has procured a purchaser or tenant who is ready, willing, and able to buy or lease the specified property according to the stipulated terms. *See, e.g., Hutchings v. Slemons*, 141 Tex. 448, 174 S.W.2d 487, 489 (1943).

■ In this case, Carpenter has not alleged or cited evidence that Enron ever agreed to actually exercise its renewal options under the lease. Therefore, whether Carpenter satisfied its obligation to produce a ready, willing, and able tenant *with regard to the renewals* was not established by the law of the case, but instead had to be determined constructively based on whether Met-Life received a benefit from the projected occupancy of Enron beyond the base term of the lease. As *Carpenter I* recognized, this was a fact question on which the parties presented conflicting evidence. On remand, the jury resolved this question against Carpenter, and Carpenter's points of error demonstrated no reversible error. Accordingly, Carpenter's motion for rehearing is overruled.

AMIDEI, Justice, dissenting on motion for rehearing.

I respectfully dissent to the majority's opinion on motion for rehearing.

Regarding the majority's first reason in overruling Carpenter's motion for rehearing, it is immaterial whether Carpenter filed its own motion for summary judgment in *Carpenter I*. The case on the first appeal was reversed and remanded with a clear statement of the law of the case. The trial court was required to render judgment for Carpenter once the parties closed notwithstanding Carpenter's failure to file a motion for directed verdict. At the time of the trial, the trial court should have applied the law of the case to the uncontroverted facts as discussed in my original dissent. The case should not have been submitted to the jury. It was the trial court's duty to take such action because *Carpenter did not waive the law of the case* by not urging a directed verdict at that time. This is similar to the error of the trial court in *J.O. Lockridge General Contractors, Inc. v. Morgan,* where the case was submitted on a theory contrary to the law of the case. 848 S.W.2d 248 (Tex.App.—Dallas 1993, writ de-

nied). In *J.O. Lockridge,* the appellate court rendered judgment as the trial court should have rendered notwithstanding the jury charge and verdict because it was not submitted consistent with the law of the case. *Id.* at 250–51. In response to the majority's first reason, the pertinent point of the *J.O. Lockridge* case is that we are authorized to apply the law of the case to the undisputed facts and render judgment for Carpenter notwithstanding the absence of a motion for summary judgment or motion for directed verdict urged by Carpenter. *Id.* After the case was remanded in the first appeal, the summary judgment against Carpenter only applied to establish the law of the case and ruled out one of Carpenter's causes of action. The summary judgment, however, did not prevent Carpenter from recovery by any procedural vehicle it chose in the case on remand. Carpenter could not waive the law of the case by failing to file either a motion for summary judgment or a motion for directed verdict. *See id.* at 251.

The majority's second reason in overruling Carpenter's motion for rehearing is that its brief waived the law of the case doctrine by only having points of error concerning the improper admission of evidence and factual insufficiency of the evidence and by only praying for remand. Again, the point of the *J.O. Lockridge* case is that no matter what error the trial court or Carpenter made, Carpenter *could not* waive the law of the case; and we should render judgment as the trial court should have done. *Id.*

The majority's *third* reason in overruling Carpenter's motion for rehearing is that Carpenter failed to show Enron agreed to actually exercise its renewal options under the lease. This reason is also incorrect. Carpenter was excused from proving Enron actually agreed to exercise the lease options because MetLife and Enron conspired to terminate the lease to avoid Carpenter's commissions which would have accrued under the renewals. This action by MetLife made it impossible for the lease's condition to be fulfilled. MetLife would not have sold the property to Enron's subsidiary until the purchase price included the value of the three renewal terms. Not only did Carpenter fully

comply with the lease, but it had produced a ready, willing, and able purchaser. The action of MetLife prematurely terminated the lease, and illegally prevented Carpenter from earning the commissions it was due according to the law of the case established by this court. Also, Enron was ready, willing, and able to continue to pay rent on this building for the renewal periods through its subsidiary. The *Hutchings v. Slemons* case cited by the majority is not on point because the purchaser in that case did nothing like MetLife did to avoid the commissions. 141 Tex. 448, 174 S.W.2d 487, 489 (1943). The purchaser in *Hutchings* only resisted paying the broker's commissions because the broker's contract was oral. *See id.*

To deny Carpenter its commissions would be a gross miscarriage of justice. We must apply the law of the case to protect our opinion in the first appeal.

I would grant Carpenter's motion for rehearing.